Good morning. May it please the court, Gary Scalabrini on behalf of the appellants, cross appellants, cross appellees and defendants Melanie Moore and state insulation. I'd like to reserve at least five minutes for any rebuttal to watch your clock please. Thank you. Oh, what's that? It said watch your clock. It goes down. I will. Thank you. There's been extensive briefing on this matter so certainly if there's any questions with respect to any item please let me know and I'll address those specifically. In general, I think in especially in the reply brief, the reverses the decisions with respect to their issues they raised on appeal that a great injustice would be done. I think that's clearly not the case. When you look at this matter from an overall perspective, which I think is important, you have the plaintiff enticing Mr. Moore to invest 1.5 million dollars in this project and if you look at the excerpts of records tab 39 through 43, you see these emails where he's constantly pushing this project and saying and you know you're not going to lose money. I'll secure everything that you put into it with my own assets. This is a great deal. However, due to the mismanagement by the plaintiff and his general contractor partner, Mr. Munson, this case went as a court noted said by Mr. Moore, held in a handbasket. The project ended up going way over budget, cost much more than anticipated and the person that ended up having to put money into this project was Mr. Moore. Up to what was in the record up to a seven million dollars. 2.1 of that was that amount paid to subcontractors, vendors and suppliers which to this day Mr. Hardesty continually tries to recharacterize as not being a payment to these individuals. It was paid. So let's let's let's bring your what the stuff you just said the claims you just make about Mr. Hardesty's fraud into the context of the issues that we need to decide on this appeal, right? So your clients filed the bond action, right? There was a bond action filed. There was a bond action filed. Your clients went after the money and there was a bond action filed. And that case, I'm just And that case ultimately was terminated, right? Right, it was dismissed. Okay, so no money changed hands as a result of that bond action, is that right? At all. Okay, and then but then there was but but when that case was dismissed there was an interpleader action? There was an interpleader action, correct. Okay, and that was the that was the insurance company putting like seven hundred fifty thousand or eight hundred thousand dollars depositing with the district court? Correct. Is that right? Okay, and and the the purpose it what was the purpose of that interpleader action? What was what was what what were the parties hoping to get resolved in that interpleader action? At that point in time there was seven hundred fifty thousand dollars which was money that Mr. Moore put forward as part of a letter of credit for the bond. Once the bond action was dismissed the bonding company had seven hundred fifty thousand dollars that they needed to do something which which it should have gone directly to Mr. Moore. It was his money. However, that was challenged by Mr. Hardesty and as part of I believe the settlement, I'm trying to remember specifically, but as part of the settlement of the bond action, the money was interpled. Okay, and so the money was interpled and it's sitting there and but that case never got litigated either, right? Because there was this other lawsuit that that that was filed in the Central District of California by Mr. Hardesty against your clients and then your clients counterclaimed against Mr. Hardesty. Correct. And and your clients the counterclaim against Mr. Hardesty was for fraud? Correct. And and so what was the basis of that counterclaim? The counterclaim was fraud for inducing them to get into the project in the first instance. Based on the stuff that you were talking about when you first took the podium. Okay, and then so. With respect to the amount of the bond being put forward and then not released. Okay, and so that and then and and your clients made a rule 68 offer to Mr. Hardesty? No, actually Mr. Hardesty made a rule 68 offer to the Moores, which was accepted. Okay, so so so Hardesty says I agree to I agree to have judgment entered against me on your fraud counterclaims against me based on misrepresentations at the beginning of the project or whatever. And that was and so judgment was entered against Hardesty and in your clients favor on those fraud claims for how much money? $750,000. And that was the money in the interpleader action? As part of the rule 68, what the parties agreed that the money would come to pay that judgment the one the money would come from that bond action, correct. It took over a year to actually occur, but yes that's what the party had agreed upon as part of the rule 68. Okay, so judgment was entered against Mr. Hardesty for committing fraud against your client and you sort of started off this discussion. I mean that's that issue isn't directly relevant to the issues that we are here to decide on appeal, right? I gather what you're saying is you want to want to you want to clarify any misimpression that may have been left from the briefs that Hardesty is the only bad guy here. It's a pox on everybody's house. Well I think more well one would disagree in terms of the representations on the moor and whether or not that constitutes fraud and whether or not Mr. Hardesty knew or certainly should have known what the deal was with respect to the both the incentive agreement and the purchase and sale agreement, but in terms of Mr. Hardesty, he is certainly not a choirboy without I mean simply stated. Certainly there was a fraud action against him. I think the 750 is relevant to a certain degree with respect to the attorney's fees and who was a prevailing party on this whole action, but you're right that's again more context. Because that's that's part of the reason why we should affirm the district court to the extent she concluded that Hardesty was not a prevailing party. Correct. That's in part as well as the fact that Mr. Hardesty claimed at 1.10 million dollars in damages ultimately only got 650,000 that he asserted at least four claims which were on the contract as a court defined. Again I don't think they are actually on the contract. I think they're more tort issues, but assuming that they are on the contract, three of the four on the contract claims were decided in favor of the moors and not Mr. Hardesty. But again we had briefed all of that as well. One of the things... Where did the district court go wrong on the issues you're raising with us? Two things I think the district court was wrong on is one is plaintiff has the ultimate burden to show damages. That's part of their case and we get to the end of the case and plaintiff hadn't shown that. The court was unable determined from the damages were. She says as much in the record. So rather than just finding that plaintiff failed to establish essential element of the case which is damages, she allowed the plaintiff to have a second bite at the apple which... But she said pretty clearly that the reason she was doing that, I think on two different occasions, she said that the sole reason she was doing it was because she felt she had squeezed the parties in the time limits that she had imposed on them for trial initially. And I will tell you the last civil trial I had I imposed trial limits, excuse me, I imposed time limits and I about halfway through the case I realized that I had squeezed the parties and so I expanded the time limits. And boy I sure would and if after the close, you know, if after the close of evidence I came to the conclusion that I had squeezed the parties, that I had been unfair to the parties in terms of the amount of time I gave them to present their case, I sure hope that I would be allowed to cure that injustice by reopening the case. I understand that to a certain degree but we're all playing by the same rules and the district court and district courts now to control their dockets impose time limits. Yeah the upshot was so this this often happens with trials is that what gets short shrift is damages, right? Because you end up spending more time than you need to or than you wanted to on liability and damages end up getting short shrift. Damages were not short shrift. I spent a full day, well part of one day and part of the next day cross-examining their expert witness which was a witness that they were depending on for the determination of damages. You mean after it was reopened? No, no, before it was reopened. I'm pretty sure, I'm trying to remember it's been a few years, that I spent quite a bit of time because there was, yeah it was day three and day four on the first phase that I took their cross. And in court limited, if you look at the court's order, limited what the plaintiff could present from his expert as to damages because I'd spent so much time with them. I just don't think the plaintiff made their case and they were given a second bite of that. So are we supposed to say that we did, I don't believe Judge Bichotte when she said that the sole reason she opened the case was because she was concerned that she hadn't given both sides enough time to present their cases? I think it's unfair to Judge Bichotte to say that, to imply that she was being disingenuous. I just don't think she analyzed it properly. Would it be any more fair if she sat there and said well you know because she wasn't entirely sure about liability to say you know you defendant didn't have a liability. Maybe there are some issues on that you wanted to direct as to your defense on liability and you should give be given extra time as well. I think it's a slippery slope. Plaintiff knew how much time they had. They know damage is a big part of it. Damages were a big part of this case and I believe that they should not have reopened it. Okay so let's assume for a minute that we don't, we don't know what Judge Bichotte did. It's okay what she did. Let's just assume that for continuing this argument. You said there was another, I asked you what was, what did the district court do wrong for purposes of that you want that are concerned to us on this appeal? First one okay damage is issue and what you just went through. Right. What's the next one? The other one and again we put forward four in the brief but the two I'll focus on today. The other one would be just viable reliance and again and I understand the court's ruling however this is a case where plaintiff is ultimately and we'll get to this probably in, well after they talked, is arguing that there is fraud in the execution. That he didn't know what he was signing. That plaintiff made certain references. The purchase agreement. Right. The PSA. The purchase and sale agreement. So he didn't understand because she gave him only the signature page and he signed it and didn't know. Now we dispute that factually but even if one would accept that as true, I don't, but if one would accept that as true he signed it again in February, initialed all of the things. Wasn't it switched? Wasn't there a change between the first signature and the second signature? Well according to plaintiff there was a change between the initial draft he was given which was on the 22nd. We can look at the two drafts and there is a change. So well between the first one, the second one, but keep in mind the second one and let's just call it the second one for now. The second one is signed again in February. So when you're talking about the first one you're talking about the incentive agreement. Okay. Then there was the initial draft of the PSA. Then there was. He saw that. I'm trying to remember if he, he says he saw it. Certainly yes. I remember someplace. Right. He's saying on the 22nd I believe it was. Yes. That he had seen that. And I didn't. And I believe that's true. He did. He was given a draft of that. She then went out of town. And I don't, I do not understand him, I did not understand him to say that he signed that initial draft. Right. He did not. He saw it. He saw it. He looked at it. Right. And then. He said. And then. She takes it. She, she, well she didn't even take it. She didn't. Or whatever. She left it with him. Then she sends him a new draft. Right. And that draft he signs. Has some changes to it though. Right. It has a change to it. A couple changes. That's true. He sends it back to them. Then he signs another draft in February of the same, of number two, at the offices of the attorney I believe it was. And this is in February. Along with the notice of the transfer as well. And one of the things that gets lost in all this. So that's. If I could just interrupt you real briefly just to clarify. So this. You're making a clear error argument right now. Right. This is. You're saying that. That would be clear error. You're saying that the judge Bichon made clear. Committed clear error in determining that that he justifiably relied on the more Ms. Moore's prior assertions. Because in the in the in your briefs it seemed like you were talking about. You're saying well because it was in the contract as a matter of law there can be no justifiable reliance. But now it seems like what you're saying is she made a factual mistake. And that's where I think I'm. I want to make sure that I'm correct. Essentially because what you will forget about what's in your brief. Let's just talk about. I mean that has to be clear. That has to be clear error. Well right. I mean in other words that has to be reviewed for clear error. That's not a legal question that you're raising with us now. Well except for the fact that this is what I can't call at the top of my head. Is that. And it is proved. So that if someone is presented with a contract. And they have an opportunity to read that. Then I do think you could argue that as a matter of law. Right. And you argue. You argue that. You argue that in your brief. And that's wrong because the California Supreme Court has said that it's wrong. But you're now making it seems to me a different argument. Which is that Judge Bichon didn't understand the facts. That's true too. I thought. I thought it either. I'm hesitant to say that because she is a very thorough judge. The second. When they do the second version. That somebody. Moore's wife or whoever it was. When they spoke with Hardisee. Yes Melanie Moore. Said it was the same. She never said that. At the first. She never. He. She found it. Judge Bichon found it. I don't think she says. Somebody. She found that. I think what she said. Is that. She didn't state otherwise. There's a difference. I don't think. I'll have to go back and read it more carefully now that I hear you. But. I had understood it to be that. The reason. That it was said to him. That there had been. It was the same. I don't know if that. I don't recall if that was. I don't recall if that was the second time. With the second version. Or the. When he came in the third time. Initialed all that stuff. I can't remember. And I'm. I'm trying to remember myself. But I. That. That. I thought that was what was critical for Judge Bichon when she said he just. He justifiably. Here's what she said. Melanie Moore had represented that the final version of the purchase and sale agreement was substantially the same as earlier drafts Hardisee had read and he understood it was simply memorializing part of the agreement they had reached through the incentive agreement for the purpose of submitting the transfer to H. U. D. That's her finding. Okay. Then that's a finding. And I'm. I'm mistaken. I have. Well. But go ahead. Those are your two. I know. I realize there were other. But I just wanted to make sure because it. Because you're asking us. At least on your appeal. You're asking us to reverse her. And it looks like it all is relating to. Clearly. You know. Our review is of the facts. You're asking us to overturn her facts. Well, with respect to reopening the case, I do think that's a legal issue. That's a discretion. Right. That's true. She had discretion because this is not. This isn't a jury trial. That's true. And under the rule, I think which rule it is. But she has a lot of discretion about. She does have discretion. Reopen. So it would be a piece of discretion. Okay. You want to save five minutes and I'll give you some time to respond on the cross appeal. Okay. Thank you. Thank you. I appreciate that. Good morning, Your Honors. And may it please the court. Janet Gertz on behalf of John Hardesty. I would like to save seven minutes for rebuttal. And of my time, I would like to have my colleague, Mr. Moshe Davey, take three minutes. Okay. But we're not going to stay here all day. So you've already taken out ten minutes by that. Okay. So that means you have nine minutes and 38 seconds on this round. Thank you. Okay. The district court's factual finding of fraud was sound. The district court's error was in not granting Hardesty the complete relief that was required to be given under the rescission statute. More would argue that construction costs that are increased more than what is anticipated is an excuse for defrauding the general contractor. That simply is not the law. Stated differently, it appears as though Moshe Moore's argument is that he who has the gold makes the rules. Rather, justice is what should rule. I would like to clarify the facts regarding the counter-defendant's offer of judgment pursuant to Federal Rule of Civil Procedure 68. The issue there was our client wanted to dispose of this interpleader action that was in Tennessee. In order to do that, the most simple way was to simply provide a counter-offer of judgment under which the amount that was interpled would be dispersed and that the action then would be able to be dismissed in its entirety. As such, the counter-offer, which is at excerpts of a record 884, and that is the Moore's excerpts of record 884, if the court would read it, it shows that it was actually a settlement offer. And there was a settlement offer that required that. But he wanted the interpleader action to go away, so he agreed to have a fraud judgment entered against him and pay $750,000 for that interpleader action to go away. Rule 68 would normally provide that, Your Honor. But in this offer of judgment, it does include a disclaimer that this is not an admission of liability by counter-defendant as an admission that counterclaimant has suffered. But was judgment entered against your client for fraud, for the fraud counterclaims? Judgment was entered on this document. Okay, then why are we getting into a discussion about the reason why he agreed to have judgment for fraud entered against him and agreed to pay $750,000? I mean, I assume you all could spend, like, many days, you know, arguing about who's the good guy and who's the bad guy in this case. All we have is the fact that judgment was entered against your client for fraud. And that your client and that he had to pay $750,000 for that fraud. And the contents of the offer of judgment. There is another fact, however, and that is that one of the preconditions that the, that Hardesty put in this offer of judgment was that as a result of it, as a condition, that all, that the Tennessee action, including cross-claims and counterclaims brought by any party, shall be dismissed in their entirety with prejudice. Okay, but what, so what? Yeah, why are we wasting all this time on this? How does that relate to this? Because it is still pending. They have not been dismissed. Who hasn't been dismissed? The Tennessee action has not been dismissed. How does that, how does that all relate to what's on appeal before us? You're both complaining about what the district court did. Correct, Your Honor. All right? And I just, he just told me why she should be reversed on issues that are important to them. Right? Correct, Your Honor. All right, and you have a reason why you want the judgment reversed as well, correct? Correct, Your Honor. And that is because complete relief was not given to our client. Our client. Now, complete relief in the, in our case, the district court case here. In the district court case. So what is, what is this business, why are we wasting our time on this other stuff? Because this other stuff shows the injustice. Well, forget the injustice. I want to, I'm not going to reverse somebody on a general notion of injustice. And I don't think. We've got a, we've got a very difficult case that was decided very carefully by Judge Bichon. She issued detailed findings of fact and conclusions of law. If you're challenging the factual findings, our review is for clear air, which is very differential. So you need to convince me that there's some basis on which we could say that Judge Bichon either clearly aired on the factual findings, it's obvious, or there was a legal error. You haven't said anything yet. Your Honor, it was a legal error. And the legal error was failure to provide. Which one? What thing that she did was a legal error? She failed to provide the complete relief that is required under California Civil Code 1692 for rescission. What? Which is that she should have rescinded the entire transaction, and she should have restored. You mean she should have invalidated the incentive agreement? Is that what you're saying? She should have invalidated the incentive agreement. However, that's another. Why? Why was that an error? That's another legal error. Okay, why? The incentive agreement was not valid. Why? Okay, why was it not valid? Three very good reasons. It wasn't signed. It said it needed to be signed. As a matter of law, it wasn't valid. Two, there was a precondition that HUD was required to give its consent. That was not valid. To the incentive agreement? To any transfer. So the incentive agreement, in the incentive agreement itself, it said that HUD's approval was conditional upon, was a condition of any transfer. And the reason for that is because HUD regulations required that for the transfer, what they call a transfer of any physical interest, that it is required that HUD's consent be given before that transfer even become effective. And that's in the HUD guidelines that we attached as an attachment to our supplement, statutory supplement. Specifically, I will point the Court to the statute. So is your argument that the incentive agreement is illegal? Two, the incentive agreement is not a valid instrument to pass or transfer the shares. Why? Because it was not approved by HUD. HUD requires that in any HUD project, that any transfer of membership shares. The incentive agreement in this general scheme of building this low-income housing financed by HUD, this incentive agreement which contemplated the transfer of shares in the development is of no consequence. Of no consequence, Your Honor. I point you to statutory supplement, page 112. Until HUD gives preliminary approval of the transfer of physical assets in writing, the transaction may not take place. HUD will prosecute to the fullest extent possible any unauthorized transfers. Was there anything else that was covered by the incentive agreement besides transferring assets? Yes, Your Honor. There were specific provisions regarding payment of $380,000, which was the return of Hardesty's capital that he invested. And then there were other provisions respecting milestones and waiver of salary rights that he had as both the general contractor and an employee. And then the payment of a bonus. So there were multiple things that were in that agreement. And I would grant you that, yes, HUD's approval would not have been required for those provisions. But certainly it was required before. So when they finally really recognized or whoever, I don't know how this all came about, but at some point somebody said, or maybe those who even contemplated the incentive agreement, that there would have to be HUD approval and they would have to do whatever was required to get HUD's approval, which apparently was this purchase and sale agreement, whatever it's called. Correct. Right? Correct. And that came a short time later. Very short time later. In fact, I would like to address the chronology. So why can't you look at the incentive agreement? I mean, I don't understand. So what you're saying, in order for your argument to work, you'd have to say that the material element, I mean, that was the whole essence of that incentive agreement, couldn't do it. Therefore, it's of no consequence. But there, as you just pointed out, there are many other aspects of that incentive agreement. And that would be the question of whether it's a divisible contract. And we did argue that before the district court, that it was divisible. But that the transfer of the shares could not have taken place until the purchase and sale agreement was signed. Okay. So we get to the purchase and sale agreement. You get to the purchase and sale agreement, which the court voided for this very, what I'm going to refer to as the bait and switch, which is there was a provision in the initial draft that said that Mr. Moore was going to provide a bridge loan. And then that bridge loan was going to be given to Legacy Point. And that was going to enable the subcontractors to be paid. There was a second promise that was very important. And that was that he was not expecting reimbursement from Hardesty. He was saying that he would be reimbursed either through a draw from the HUD mortgage proceeds, or he would receive it as what is called surplus cash, meaning that it would be out of the rent proceeds or out of sale proceeds. And this is a common construct in HUD financings, that because there is no secondary financing allowed in these type of projects, that if there is a contribution that is made, in order to get that contribution back, that you take it in the form of, you agree to take it in the form of surplus cash. And that is what Moore did. And that was important because it was only through that that Hardesty would receive any consideration at all. Do you want to give your co-counsel three minutes? Yes, Your Honor. I will do that. Yes, it's good afternoon. Yes, it is. Thank you very much, Your Honors. I'd like to focus on the securities fraud claim. Judge Bichon found no violation of the securities laws. The mistake that she made was that she did not test for whether or not there was a security at the time the fraud occurred. California defines what a security is. And it defines a security as an interest in a limited liability company. But there's an exception if the challenging parties, meaning the Moores, demonstrate that all of the managers are active participants in the management of the company, that it becomes something other than a security. Could I just ask a clarification question? Sure. This only matters if we reverse Judge Bichon on her factual finding that the Moores did not commit fraud in connection with the incentive agreement. Is that right? It matters because you don't have a securities fraud claim because the share is transferred pursuant to the incentive agreement, as Judge Bichon found, right? And if we decline to reverse to conclude that Judge Bichon committed clear error in her finding that there was no incentive agreement, the securities claim doesn't matter. Is that correct? You are correct. Okay. However, the Moores admit that the shares transfer pursuant to the purchase and sale agreement. They do. In fact, this is their admission. Okay, but we're reviewing a ruling by Judge Bichon, right? So are you saying that she clearly erred because she ruled contrary to an admission by Hardesty? It's cumulative. It's their admission. Her own findings are internally inconsistent. Her findings contemplate that they are. How are they internally inconsistent? Because as part of her findings, she says that the incentive agreement contemplated that there would be a further agreement pursuant to which the shares would transfer. That's inconsistent with saying that the incentive agreement. What page of her ruling is that? Do you want to show me her ruling? Yes, Your Honor. I will. If you would give me a second. Sure. And it makes sense because the incentive agreement. You can do it after or unless you have it available right now. And it makes sense. The incentive agreement was a letter of intent. A letter of intent contemplates a further agreement. So is your whole argument that this was just a whole scheme on Moore's part? Yes, Your Honor. That when he entered, when they entered into the incentive agreement, it was all just, you know, step one of. Yes, Your Honor. Yes. And the reality was, and this is what we call the structural fraud, and it's very important to understand that the person responsible was not John Hardesty. It was the project owner. The project owner is responsible to pay. The project owner pays the general contractor. The general contractor then pays the subcontractor. The only reason, it wouldn't make any sense, the only reason why Mr. Hardesty parted with 27% was because he wanted to avoid personal liability. Why? I understand your point. I read that in the briefs, but I'm just trying to contemplate here. What you're arguing is that Moore, either at the time they negotiated the incentive agreement or before, plotted this all out and knew that he was going to do a bait-and-sweep. You know, he's going to get him to go along with the transfer, all these other issues that your co-counsel just went through with me. And then he knew that they would have to get HUD approval, so they had a second agreement. I mean, it's all very, it's quite a scheme. But it requires a very devious mind to do this, which is not pay off an extinguished debt, but rather go buy it. When you buy debt, if the goal was, let me just pay off the subcontractors, I would just go pay them off, their debt is gone. He didn't do that. What he did was he devised a scheme where he bought those claims. He bought those claims for purposes of suing. What was the advantage of buying the claims? The advantage of buying the claims was that he then had an asset on which he could sue. Had he simply paid and extinguished the debt, then Hardesty would not have had any liability. So the insurance company, is that what you're talking about? Yes, on the indemnity, on the bond. Okay. But he could have gotten, he still could have gotten paid, as your counsel said, from the excess surplus, cash surplus down the line. And he did. He already, he has been paid three times now. He's been paid because the LPA issued a surplus cash note to Mr. Moore on account of the claims that he bought from the subcontractors. And, in fact, that's logical because the owner was. . . Let me ask you this. So Judge Vershonten goes through each of the events in a very detailed way. There's really no, her findings don't address this whole idea of a structural scheme or fraud. She didn't understand it, Your Honor. She did not understand. And so we look at her findings and she says, okay, they negotiated this incentive agreement. Finds no fraud on the up and up. I understand. And then she gets, you know, a couple of weeks later or whatever, 10 days or whatever it was, we get to the purchase and sale agreement. And then that's where she zeroes in and she says, wow, you know, there was some funny business. Switching things around and changing numbers. So the letter of intent was to be superseded by the purchase and sale agreement. And she did find that in the purchase and sale agreement there was massive fraud. And we're suggesting that, given the time frame between the two and given the time frame because it was part and parcel of the same scheme, but it really didn't matter because as a factual matter, and I found the citation to her, she says on page four, further the district. Hold on, hold on. Give me a second to get there. Okay. Page four of her ruling, ER-171. It's really ER-0173 where the district court found that, quote, a separate agreement needed to be signed specifically for HUD to effectuate the transfer. In other words, there needed to be a separate agreement. Okay. The purchase and sale agreement. And that means that how does that show that she clearly erred? I'm sorry, I'm not following. Because I'm coming back to your original question, which was on the securities fraud claim, you indicated that if the transfer took place pursuant to the incentive agreement. What you said, what I think you said is that her ruling, you were saying that her ruling was internally inconsistent because the. Because on the one hand, she said the transfer occurred pursuant to the incentive agreement. On the other hand, she says a separate agreement needed to be signed specifically for HUD to effectuate the transfer. Right, for HUD to effectuate the transfer. Right. And for HUD to effectuate the transfer. But she concluded that the transfer actually occurred in connection with the incentive agreement. And we only review that for clear error. I understand. And there's overwhelming proof. Their admission, the presence of a purchase and sale agreement, common sense where you have a letter of intent pursuant to which you follow up with a purchase and sale agreement. You've come across that all the time. There's always a letter of intent. And then you have a final agreement, the purchase and sale. And the fact that the actual transfer took place pursuant to the purchase and sale. So why couldn't the incentive agreement actually transfer the shares? I mean, it just wouldn't have any effect for HUD's purposes. It didn't do that. Why not? Because she contemplated a further agreement itself. On its face, it said there would be a further agreement. You're saying it's not a binding contract. I'm saying it's not a binding contract. More importantly, the shares didn't transfer. Well, they can't. If it wasn't a binding contract, they couldn't have transferred. That's part of it. Did you argue anywhere that this incentive agreement was never a binding contract? Did you ever argue that below or in your briefs in this case? We did in our briefs. We said that it was an unsigned document. And Judge Beauchamp found that because the parties performed, she found performance somehow circumvented the fact. Okay. So now I have two questions. My question in response to what you just said is where did you argue in the district court or in your opening brief that this was never an enforceable contract because it was unsigned? Did you argue that in your opening brief in this case? In the opening brief, there is in our REM, and I'm sorry, we divided it up. I was just doing the securities fraud piece. So I'll ask Ms. Gertz to answer. She's going to have some time. You're over her other time. Why don't you let Ms. Gertz answer that after we have five minutes from over here. Okay? That's what we're doing. I'm the gatekeeper. No, sit down now. And he gets five minutes, and then she can answer that question.  You're welcome. Let me make this quick. Well, why don't you just answer this question. Sure, absolutely. So I understand their argument that the shares couldn't transfer under the incentive agreement so that her findings are internally inconsistent because she found that the purchase and asset agreement was invalid. So the shares couldn't have transferred under that, but nor could they have transferred under the incentive agreement, which she did find was valid. There's really no distinction between the incentive agreement and the purchase-sale agreement with respect to that issue. Both of them are occurring before HUD approves. In fact, the actual transfer is pursuant to an assignment, which I don't think either party stated in their briefs, but that would be tab 35. You filed, like, 500 pages, and you didn't explain the basic transfer. Well, no, it's there, and it is, like I said. Tab 35 is actually an assignment, and in that it states that the assignor, which is Mr. Hardesty, assigns, transfers, conveys, sets into assignee, and in all of assignee's right title, et cetera, in the 27 percent interest. So what was the question? No, just a couple of quick things. One with respect to the discussion as to whether they argued below that it was invalid. I don't recall that anywhere, and I haven't seen it in the record. But she made a finding that it was valid, so someone must have argued. No, what they're saying now that it was invalid because it was unsigned. She says that in her order. She says that it wasn't signed. Right. So someone must have. I understand that because the document was there unsigned, and I think she anticipated that. But I don't think they ever pursued the issue. They didn't pursue the legal significance of that fact? Exactly. I don't recall them doing that. Perhaps I'm wrong, but I don't recall. In fact, in their post-trial brief, they explicitly state that they affirm the assent of agreement, and that's at tab 58, supplemental excerpts record 783. So even if they semi--. Their argument wasn't that it wasn't a contract or the parties entered into a contract. The argument was that they were induced as to that as well, which was rejected by the court, but they were induced to sign that agreement. That was their argument. And ultimately they. The purchase and sale agreement. No, no, this is the incentive agreement. And the court rejected that, obviously. And, in fact, in their, again, their post-trial brief, they elected to affirm the assented agreement and seek damages. Let me ask you this. Yep. What's the significance then of the incentive agreement with respect to the transfer of the shares? Well, absent because the, according to court, because the purchase and sale agreement was void, because, again, their theory of the case is that was fraud and execution, which is what she found. It becomes void. Since it's void, it would not serve as an ovation because the incentive agreement would remain in place. The incentive agreement's an agreement. The incentive agreement states in it that he's transferring the shares. As you pointed out, that would be. Go ahead. It didn't actually effectuate the transfer, though, is that. It would be part of the process. Ultimately, HUD would then look at it. And they've constantly stated, well, HUD could revoke it if HUD felt that there was something improper about it. HUD's looked at this. HUD's never revoked it. They've never asked HUD to revoke it. HUD still theoretically could revoke it, I assume. I don't. I don't know. I honestly don't know the answer to that. I don't think they would at this point. Transfers occurred years ago. So, no, I don't think they would, but I don't know. And in any case, again, the transfer was the assignment is actually what effectuates the transfer, which would occur afterwards. Could I ask you real quick, what's the consequence for Hardesty, financial consequence for Hardesty, since you started off talking about the equities? What are the financial consequences for Hardesty of Judge Bichon's conclusion that the incentive agreement was not void? You mean that the incentive agreement was valid? Mm-hmm. In terms of – What did he lose? What did he lose as a result of that? I don't think he lost anything as her determination as to that. What did the Moores gain? What's that? What did the Moores gain by her deciding that the letter of intent was – effectuated the transfer of the shares? I think it just effectuated the transfer, which, again, would mean his shares would transfer over. So Moore got the shares? I guess he did. So what's the value of that at this point? I guess I may have misunderstood your question. I apologize. I'm just asking if we reverse that and say that, no, this letter of intent had no legal effect because it was merely a letter of intent, and we reverse that, what is the financial consequence to your client? The financial consequence of my client and what Mr. Hardesty did receive. Can't you answer my question? It's a hypothetical. No, I understand. I'm trying to get to it. The financial consequences to my client is that they received 27 percent interest after they paid $2.1 million to satisfy the subcontractors and the vendors. But then they also got the money from the insurance policy, too, right? The insurance policy, you mean the $750,000? Yes. That was $750,000 separate and apart, which they put in as well. They kept putting money into this project. Like I said, they put $7 million into this. But $750,000 was for the initial bond, which they had to lend the money for because Bunts and Hardesty couldn't do that. All right. The $2.1 million is entirely separate. All right. Thank you, counsel. Thank you. I'll give them five minutes, too. We're going to be out of here by 1 o'clock. It's not 1 o'clock yet? Your Honors, if I may answer the question of what was Moore's benefit. He received Hardesty's 27 percent interest. He received a surplus note, which entitled him to repayment from the LPA. That's at our further excerpts. How much was that note worth? That was for the amount of $2.479,321.80, so essentially the 2.3 with interest. And so Hardesty got nothing. The only thing, and the district court made the finding the only thing he expected to get out of this deal was freedom from a bond claim. He didn't get that, although he had been promised that that's what he would get. So there was no consideration. But he has that now, right? Well, I'm not sure one can unscramble that egg. You have a general contractor whose reputation has been ruined. Okay, but in terms of money, in terms of the money, nobody can bring a bond claim that the company can then go after Hardesty for at this point, right? Well, to go to my earlier point. After Judge Besant's ruling. To go to my earlier point, the Tennessee action, they're actually suing John Hardesty, they being Mr. Moore and Legacy Point, who he controls. They are suing John Hardesty for nonpayment and Munson Hardesty for nonpayment of those claims. I don't know why that hasn't been closed yet. Maybe the district court hasn't done the administrative work to close the case. Maybe the company hasn't done the work to close the case. But if anybody actually tried to go after Hardesty in that action on a bond claim, that would be kicked out, right? Because of Judge Besant's ruling on the purchase and sale agreement. One would hope so, but technically speaking, they still hold the claims. The claims are still alive. They were not paid. They were simply purchased. But the bond action was dismissed. The bond action was dismissed. That's correct. The interpleader action has not yet been dismissed. That's correct. That's correct, Your Honor. And there's, what, $50,000 left in the interpleader action because your client agreed to entry of judgment against him for the counterclaims against him for $750,000, correct? Yes, Your Honor. Yes, Your Honor. But I would say that that's, to a certain extent, beside the point in the fact that what should have been given was rescission. And rescission is not accomplished under the Wong case by simply trying to say, all right, I'm going to pay you for your discomfort. Rescission means you unwind, and that's what our client prayed for and that's what our client should have received. Let me go also to the chronology with respect to the incentive agreement. The question of whether the incentive agreement is valid or not in some ways may actually be irrelevant or one could go from an alternative path of determining it. And that is the fact that where I think the district court truly erred is in determining that there was no fraud in the incentive agreement. But there was in the purchase and sale agreement. I think she lost the forest for the tree. She was looking at the bait and switch as opposed to the larger transactional fraud. The transactional fraud, in fact, the three findings that she made of misrepresentations, i.e., the bond claims would not be brought, that Moore would seek the payment from the LPA out of surplus cash or out of HUD draws. Where was all of that contained? It was in the incentive agreement. So how can there not be fraud at the time of the incentive agreement because where the incentive agreement is where these misrepresentations were made. Also, with respect to the chronology, the incentive agreement was signed on January 16th of 2009. The first draft of the purchase and sale agreement was January the 22nd. The final purchase and sale agreement was signed before January the 26th, although it was dated the 26th. It was actually signed before that if you look at the record. The court indicated that Moore did not intend to bring a bond claim until later, and that's why there was no fraud in the incentive agreement. Well, it doesn't make sense because what she indicated was that he presented these claims to HUD, and then they were rejected by HUD, and then as a result he decided, well, I'll go after a bond claim. The bond claim was much later, and he would not have been able to have presented those claims to HUD until after the purchase and sale agreement had been signed. The point being, the fraud was from the beginning, the structure was from the beginning, the trap was set in the beginning in the incentive agreement.  I'm sorry? That theory about what happened. The theory regarding the execution of contract theory of no signature on the incentive agreement. Is that what you're saying? On the incentive agreement. Was that all, that whole theory presented to the district court? The answer, Your Honor, is it was not because we did not anticipate at the time that the court was going to take a hyper, what I would call a hyper-technical contract analysis of the issue. Well, if you stood up there and said this whole scheme is nothing but fraud riddled through the whole thing from beginning to end. Correct. That was our case. We were not expecting the district court to create a. . . But is that the way the case was teed up for the district court? That's my question. The way the case was teed up for the district court was this was a fraud in the transaction, and in the entire structure, the entire structure should be unwound with no distinction between the purchase and sale and the incentive agreement. And that would separate the letter of intent from the purchase agreement. So if they're both valid, they're both valid. If they're both invalid, they're both invalid. That is correct, only with the distinction that with the purchase and sale agreement there was the added additional fraud of the bait and switch, but it doesn't negate the other fraud. All right. Thank you, counsel. I think we have this understood. And so Hardesty v. Moore will be submitted, and this session of the court is adjourned for today. Thank you, Your Honor.  Thank you, Your Honor.
judges: Wardlaw, Paez, Chhabria